## The Niobe.

*(District Court, S. D. Georgia, E. D.　April 5, 1887.)*

Collision—Vessels at Piers—Mutual Fault.
　　The harbor-master indicated a berth at the wharf for the incoming Niobe where the small sloop Pleasant Day with no one in charge was lying, and the Niobe swung in without making effort to remove the sloop, sinking the latter. *Held,* that the Niobe and the Pleasant Day were both at fault, and the recovery is reduced accordingly.

*(Syllabus by the Court.)*

*Isaac Beckett* and *R. R. Richards,* for libelants.
*A. II. MacDonell* and *J. R. Saussy,* contra.

SPEER, J. On the twenty-third day of March, 1886, a small sloop with a batteau bottom might have been seen beating her way up the Savannah river. It was March, and its conventional wind was blowing a pitiless gale from the northwestward, and the tide was pouring its tur-

bid volume down the broad reaches of the Savannah, and, altogether, there was nothing in the weather which indicated that the sloop called the Pleasant Day should be out upon the waters, and yet there she was. She had, under the skillful pilotage of two colored mariners, threaded the sinuous and intricate waters that trend from Savannah to the neighboring port of Thunderbolt, or, more accurately, Warsaw. When the Pleasant Day came abreast the Savannah, Florida & Western wharves, whether a gust of unusual violence blew down the river, or whether she sought instinctively her accustomed anchorage in the Bilbo canal, the evidence is silent; but certain it is that she "pulled for the shore," and made fast to the wharf. The weather-beaten crew without delay betook themselves to a neighboring house of entertainment, having first requested a lone fisherman, who, in despite of the severity of the weather, was angling from the wharf, to give an occasional eye to the Pleasant Day. About that time the Norwegian bark Niobe, in charge of two tugs, one towing her with a hawser from her bow, and the other made fast to her starboard side, came up the river against the same stress of wind and tide which had embarrassed the Pleasant Day. Further down the Niobe had been hailed by the harbor-master, Kennedy, and the pilot in charge directed by that official to put the bark on that particular spot of the mile and a half of wharf at which the Pleasant Day was peacefully lying. The Niobe accordingly was towed up the stream above that spot, the tug ahead cast off the hawser which held her against the stream, and the north-west wind, the downpouring tide, together with the impulse of the tug fastened alongside, swept the Niobe rapidly inshore. These preliminaries adjusted, it seemed to flash upon the Niobe's people that there was an inevitable collision ahead of them. There was much shouting and "running to and fro" by the pilot and officers of the Niobe, and "Move that boat!" was the cry; but the shouting was directed at no one in particular. There was nobody to move her. The lone fisherman was engrossed with the finny inhabitants of the Savannah,—presumably at that moment had a bite; in any event, he was pre-occupied, or in reverie, and listened with a callous and indifferent ear to the outcry of the pilot and the Scandinavian objurgations hurled at him by the master and crew of the Niobe. The harbor-master came running up, but it was all too late. The Niobe dropped her anchor, but notwithstanding, swung in with full momentum against the little sloop, which disappeared under the water; and that was the end of the Pleasant Day.

The owner of the latter brings his libel to recover damages for her destruction. Undoubtedly, the crews of both the Pleasant Day and of the Niobe were guilty of negligence. It was in broad day; the Niobe had passed up the river in full view of the berth where the Pleasant Day was moored. It was the duty of the Niobe to see that the berth was clear. There in full view lay the sloop, apparently with no one on board. She was very perceptible. She was thirty feet in length; eight tons. The Niobe's people had no right to presume that she could be, or would be, instantly removed; they knew the consequence of a collision, and yet they cast off the hawser from the leading tug with the full knowledge

and intention that the Niobe would swing in the berth. Then to shout and scream to "move the boat" was not enough (nor to drop the anchor) to relieve them from the consequences of their recklessness. If the Pleasant Day crew had not been also at fault, I would give a much larger sum as damages, but they were also negligent. They left the sloop without any one in charge, which is contrary to the harbor regulations. The undertaking of the fisherman to watch her was a mere *nudum pactum*, and carried with it no legal obligation. She was not lying where boats of her class properly belonged; but this does not give any right to a vessel entitled to that berth to crush into her, and sink her, when that result could be easily avoided. *The Canima*, 17 Fed. Rep. 271; *The Southern Belle*, 18 How. 584.

What is the value of the Pleasant Day is a question difficult of determination. Her *disjecta membra* were rescued from beneath the wave, but the Niobe had left her with a shattered constitution. Opinions as to her value vary pretty much anywhere from five hundred to fifty dollars, and one witness thought she would be dear at any price. The truth is, the Pleasant Day was not a very valuable craft. She had been moored for quite a while in the Bilbo canal, an artery which performs the same functions for the city of Savannah that the Cloaca Maxima did for ancient Rome, and was as a consequence not so pleasant as her name imported. All the sails and rigging were saved. On the whole I award $150 to Wilson, the owner of the Pleasant Day, and decree that he pay half the costs.